We're ready with our panel reconstituted. We're ready to resume and hear the remaining three cases on the calendar today. The first one is number 23-10669, United States of America v. Sharon Barnes Sutton. Thank you, Your Honor. May it please the Court. The court here in principle would not say that a statute titled Interference with Commerce by Threats or Violence could possibly apply to the facts of this case. Any fair reader of this statute would be left with a reasonable doubt about whether it covers the defendant's conduct. And when that happens, judges are bound by the ancient rule of lenity. So, I'm sorry, I'm just catching up, sorry. But when you said no ordinary person would think that a statute that criminalizes threats or violence, but I mean it goes on to reference fear as well, right? Yes, Your Honor, but the title of the statute is Interference with Commerce by Threats or Violence. Well, but I'm not even sure, does Congress adopt the title? Not necessarily, right? I think there's case law that suggests that when you're reading statutes, you do pay attention to the title. I can definitely get you a supplement to that. No, no, no, I don't think we need that. But I mean, the language of the operative clause of the statute refers to fear, and we've said that that includes fear of economic loss, right? So, I mean, I think we're really in fear land, not violence land, right? Absolutely. That is the point that I am trying to make when I'm talking about the void for vagueness part of my brief. But that's only one part of the things I want to talk about today. I also want to talk about the sufficiency argument. It is our belief that the government did not offer sufficient evidence because, no, it wasn't reasonable that Mr. Beasley believed that Ms. Sutton could do anything against him single-handedly, or based on their course of conduct. But if that's true, then why would he pay her? People pay. Was it lawful, the amount of money that she received? Was she entitled to that money? She asked for money for a legal defense fund. In fact, she was charged with bribery, and our only defense to bribery was that she was asking for money for a legal defense fund, and the jury found her not guilty of that. So based on that, yes, it would have been lawful. And that is what the jury found under the facts as presented by the government. It was unreasonable for him to believe that she would actually do anything to interfere with his future contracts because they had this long course of relationship with each other. But she had asked something of him. She had asked him to add Bennett to the contract, right? He did that over two years before 2014 when this conduct happened. This was at a dinner that happened before the contract that he was ultimately a subcontractor on was even bid. You'll find that site in my brief, and I can find it for you if you'd like me to. But that happened in 2011 or 2012 at a dinner when the idea of this contract was coming up. There was no request to bid the contract yet, and Mr. Bennett wasn't there. Mr. Bennett and Mr. Beasley had worked together for many years and knew each other, and she asked why Mr. Bennett wasn't in the contract. Mr. Bennett was a contractor with DeKalb County. I thought the evidence was in May of 2014 before Beasley's contract was up for renewal. Beasley said to Sutton it was a bad idea to add Bennett. Right, but he admitted under cross-examination that she never mentioned Bennett and she didn't ask him anything about Bennett. And again, in 2012, she said something about Bennett being added. They said no, Bennett wasn't added, and the contract was awarded to Tetra Tech with the subcontractor being Mr. Beasley's company. So before she moved forward with her vote when she asked him to add Bennett to the contract, you're saying that was in 2012? Yes, ma'am. So their course of conduct clearly showed she was not someone who would retaliate. She'd never retaliated in the past. And in fact, on this very issue that he allegedly brought up to her that day, she did not retaliate back in 2012, in 2013. But the contract was up for renewal when he paid her. No, it was actually automatically renewed, Your Honor. It wasn't up for renewal. And the only way that it could have even been brought back to the Board is if the CEO found a problem with the way it was being carried out, and he brought it to the Board. I thought there was evidence that the Board could vote to non-renew it. Only after the CEO brought it to the Board, and that is in the evidence through the testimony of both Morris Williams and through the other Board member, I can't remember his name off the top of my head, who testified. So, no, there was no way for her to unilaterally do anything to take the contract away from him. It automatically renewed. But even short of unilateral action, I mean, she could kind of flex her muscles, right? Couldn't he have reasonably concluded that she was a player? She could flex her muscles with the Board. Could he have reasonably concluded? That's all about what he did, not about what she knew. Well, he definitely testified that he was afraid of retaliation, so there's no doubt about his subjective mental state. And I guess I'm just thinking in a sufficiency challenge, you've got to convince us that no reasonable juror could have concluded that that element of a crime was met. Well, he testified that he had a lot to gain going forward, and if he didn't give her this money, then maybe he wouldn't get what he wanted going forward. He had a lot to lose in the future. His future was in her hands. Didn't he testify that he was, quote, afraid of the retaliation from Sutton if he didn't pay her? He said, afraid of retaliation. What does that mean? I mean, I had a lot to gain moving forward. Right, and that's what he testified. Okay. And in the recorded conversation on May 21, 2014, that was where she told Williams that she wanted Beasley's payments to go through him, and she explained, they left Barry Bennett out of the Snapfinger project, and then added, I figure if they don't want to deal with Barry, I understand righting a wrong, but they've got to deal with me. Somebody does. There is that recorded phone call, and Morris Williams said that what they were talking about was just the fact that the Board of Commission and the political atmosphere of what was going on was that people were not actually dealing with her as a county commissioner, and that he did not say that it had anything to do with bribery or getting money. And that conversation, when that's said, this is an over-an-hour conversation, and the government juxtaposes one part of the conversation with another part as if they were together and there's one thing that's being talked about, but this is a very lengthy conversation. Okay, but your burden is to show that no reasonable jury could have concluded that there was this threat, right? And so it's not simply whether the evidence could have been construed in another way, but whether the evidence is sufficient. Well, first of all, there was no threat, and the government didn't charge a threat in this case. They charged the use of fear. Okay, well, I misspoke, but... And that's the other part of what I would like to talk about today, which is... But isn't the use of fear is to the economic harm? That was the fear was the economic harm that he would suffer if she retaliated. Isn't that what was presented to the jury? Yes. However, I think that that is void for vagueness because of what that fear means. And I think that if we look at Snyder, which the Supreme Court just issued this past summer, that really tells us how we should be looking at these statutes. So what Snyder tells us is, first, you have to look at the text of the statute. The text of the statute is the use of actual or threatened fear. What does use mean? Under Bailey, it means active employment. So by her just asking for some money for a legal defense fund, is that active employment of fear? Secondly... May I ask you, you say that it was for a legal defense fund, but correct me if I'm wrong, I thought she had indicated that she was looking for money every month. For a legal defense fund, that was our theory at trial. You want money every month for a legal defense fund? There was a lot of money that was owed to the lawyers, yes, ma'am. And the jury, again, acquitted her of bribery based on the only defense, which was the legal defense fund defense. The undercolor of law is separate from the use of actual fear in this statute. So the statute does contemplate somebody who's a public official using the law in order to get somebody to pay them money. So that would be a distinct issue. That was not charged by the government under color of law, and there was a reason for that, because under this court's authority, if you charge color of law, you have to prove a quid pro quo, and the government could not prove a quid pro quo in this case. If you look at the history of this statute, it was enacted in 1948. The previous version was enacted in the 1930s, and it was more about things like the mobsters and labor unions organizing and committing crimes of violence and causing people to be in fear of economic loss. The structure of the statute, it's interesting that subsection B2 talks about extortion, and what it says is extortion means the obtaining of property from another with his consent induced by wrongful use of actual or threatened force, violence, fear, or under official right. Fear is very different than threatened force or violence, just like gratuity is very different than bribery. If you talk about the punishments, bribery is punishable by 10 years, and the 11th Circuit said that a gratuity shouldn't be included in that statute because it was so different than bribery, whereas the Hobbs Act could be punished up to 20 years. And I see that I am done with my time, but on rebuttal I would like to come back and talk a little bit more about the fair notice argument as well as the sufficiency. You'll have four minutes for rebuttal, yes. Mr. Wynn. Good morning, Your Honors, and may it please the Court. Connor Wynn for the United States. This Court should affirm Ms. Sutton's convictions because they were constitutional and based on ample evidence and because the District Court's evidentiary rulings were reasonable. I'd like to pick up with the sufficiency arguments that Sister Counsel was talking about a moment ago. In order to convict under Hobbs Act extortion here, the government needed to show the jury beyond a reasonable doubt two separate mens rea elements that go to the heart of the arguments being raised in Ms. Sutton's briefs on appeal. The first of those is it needed to show that Mr. Weasley had a reasonable fear of economic harm. Then second, it needed to show that Ms. Sutton had the specific intent to exploit that fear of economic harm. I'm going to start with Mr. Weasley's mens rea here because that's where we've been focusing so far. So first, there's two components to that. First, there's a subjective component. Mr. Weasley, in fact, needs to have this fear. I understand Ms. Sutton to have conceded in her reply brief that the evidence is ample to support that conclusion. What she appears to challenge is whether that fear was objectively reasonable. And so what we ask in that situation is whether somebody in Mr. Weasley's position, knowing all the facts known to him, could have an objectively reasonable fear that Ms. Sutton could and would harm him and his economic interests if he did not pay her the money that she was asking for. Now, I think kind of as a bit of ground setting here, it needs to be reasonable, right? That doesn't mean that Mr. Weasley needed to be certain that Ms. Sutton could and would harm him, nor did he need to be correct that she could or would harm him. What we're asking is whether someone in that position could reasonably believe that she could and would do so. I'll start with the could aspect of this. First, I think it's well known that Mr. Weasley had a contract with the Cobb County in this case, and it was coming up for renewal, right? Ms. Sutton sits on the Board of Commissioners, which plays a role not only in awarding those contracts in the first instance, but in deciding whether or not the contract should be renewed. Sister Counsel spoke for a moment about how the evidence in this case showed that that authority lied only with the county CEO. I would submit that the evidence is more complicated than that, and you can look to the Commissioner's testimony, Commissioner Larry Johnson and Mr. Morris Williams. They both testified that the CEO and the Board of Commissioners would play a role in any vote to renew or not renew this particular contract. Because the contract amount for Mr. Weasley went beyond $100,000, under the Cobb County procedure, the CEO would have to sign off on that, but the Board of Commissioners would also have to vote not to renew the contract. So was it incorrect then to suggest that the contract was automatically renewable? So the contract does appear to have been automatically renewable unless the CEO and the Board of Commissioners acted in tandem to make it no longer renewal. That is the posture of how that works. Mr. Weasley appears not to have understood that. He appears to have believed that the contract required the Board of Commissioners to take an affirmative vote to renew, which does not seem to be the language of the contract. But, again, we're looking at what Mr. Weasley understood, and I think that a reasonable person in his position isn't necessarily a lawyer trained in complicated county contracts or the arcane procedures of DeKalb County. So I think it's reasonable for him to have understood that Ms. Sutton was going to play a role in whether or not this contract or at least had the ability to affect it. That was the evidence presented at trial, that that was his understanding of the contract? Yes, it was. You can see this in docket entry 202. I believe it is page 143. It's on cross-examination. His understanding is that the county has to actually take an affirmative vote to renew the contract. The commissioners? The commissioners, yes, that's correct. A couple of other things as to how Ms. Sutton could, in fact, influence Mr. Weasley's interests going forward. So there's obviously the snap finger contract that we're talking about here, but he testified on direct examination that he had a number of contracts in the pipeline with DeKalb County. He works in an environmental consulting firm that does wastewater and sewage treatment. So naturally he deals with municipalities like DeKalb County, and he actually testifies at docket entry 202 at 95, pages 94 to 95, that he has many future contracts coming up with DeKalb County, and that Ms. Sutton had the ability not just to kill him on the snap finger auto renewal provision, but on all future contracts. In other words, she can ice him out, prevent him from competing in that manner. So that's another way in which he has an objectively reasonable fear of economic loss. Let me get a little bit to why it was reasonable to believe that Ms. Sutton would, in fact, exercise her authority to block him in either on the snap finger contract going forward or other contracts in the future. So I think the first thing that is worth noting is the general atmospherics of DeKalb County at the time of the extortionate demand here. DeKalb County was known as sort of a pay-to-play environment in the commission government. There was significant corruption going on and investigations and indictments at the time. In fact, Mr. Veasley testifies that when he used to work with Mr. Bennett, Mr. Bennett would have various officials bribing DeKalb County commissioners to make work happen. So I think in that context you have, just kind of from a starting point, you have Mr. Veasley understanding this is the way that business is done here, and if I don't play by the rules, I won't get any business from DeKalb County. It's also worth noting that Mr. Veasley is, in fact, aware that county commissioners can play a role in taking this kind of business away from individuals like himself. In fact, he had been on the verge of obtaining a county contract prior to the Snapfinger contract, and that had been whisked out from under him at the very last minute by a unanimous vote of the Board of Commissioners. So he's aware that business can and does suddenly vanish in thin air in DeKalb County. You can see that at Docket Entry 202, pages 41 to 42. Now, bring up Ms. Sutton specifically. And there was some discussion by sister counsel of the fact that going into the Snapfinger contract, Ms. Sutton asked Mr. Veasley to put Bennett on kind of the subcontract here. And that happens before the Snapfinger contract is, in fact, awarded. But then in 2014, when the first auto renewal of that is coming up, Mr. Veasley explains to Ms. Sutton, well, I didn't put him on there because it didn't make sense money-wise. There were better avenues for both him and my business to go about it. At that point is when she asks for a $500 payment, right? So Mr. Veasley has, in fact, turned down her very first request, but at that point she follows up, right? She insists. She's not going to let this go. It's sort of a situation maybe where you could think of this as, okay, you didn't give me that, but I'm going to get something. Can you address the argument that counsel on the other side made about the payment request being for a legal defense fund? Right. So that was their theory down below during the trial. I think the jury rejected that theory, and there's testimony that supports that rejection. First, if the jury had it, had it accepted that theory that it was just money for a legal defense fund, it would have acquitted on the extortion counts. It did not do so. So clearly it has rejected the underlying premise. And let me show you the testimony that explains why it did that specifically. On docket entry 202, pages 115 to 16 and 159 to 60, Mr. Veasley testifies that while he was collecting money for a legal defense fund, he was receiving $500 a month from these $500 monthly payments. There's two pay streams going on, but what the money she's asking for, that $500 a month, that's entirely separate. Not only that, you heard miss, the jury heard miss Sutton on government exhibit 15. That's an audio recording where she discusses the $500 payments that she's receiving from Mr. Veasley. And she says, she's not going to be no Michael Hightower. Now, Michael Hightower was a DeKalb County government official who was caught engaged in bribery and extortion in public. And she's saying, I'm not going to be caught in that posture as I'm taking these $500 payments from Mr.  I think all of this gave the jury ample grounds to know what was really going on here. Not. Was there evidence presented in the record that other individuals were making monthly payments to the defense fund? Yes. Well, not monthly payments. No. Mr. Veasley testified that he did a gathering of money from a number of  That was in July of 2014. But based on the record, that appears to have been a one-time gathering. There was no suggestion that it was on a monthly recurrent basis in the way that Miss Sutton was planning to set up her extortion of payments. The final thing that I think is worth bearing on for a little bit is Miss Sutton's own intent here to exploit Mr. Veasley's fear of economic harm. And I think there's, there's evidence in the record that she knew that Mr. Veasley was an entrepreneur in a new startup business and that he was, that he had been on hard economic times recently and that she then conditioned her support for him on the snap finger project going forward on his $500 payments. She's taking advantage of his precarious financial position. And you can see that she had that knowledge. Three pages, 200 to 201, which reflects that she knew before she ever made these requests that he had been on difficult economic times. And then I think maybe the point that gave the jury just the clearest glimpse into Miss Sutton's mindset comes in GX 13. And you can also see it at docket entry 203 at 203 to 04. And this is during her conversation with Mr. Williams, when she, when he's informing her, when he and her are discussing the payments from Veasley. And she says, look, I understand writing a wrong. If he wants to block out Mr. Bennett who had fired Mr. Veasley in the past, that's fine, but they've still got to deal with me. No matter how you go through this, Miss Sutton was going to get her cut of the money in ensuring. And frankly, probably whoever was going to be awarded this subcontract for the snap finger project, but because it was Veasley, she was going to get her share. I think that's all I want to say on the sufficiency arguments in this case, unless the court has any further questions there. I'm happy to talk about the constitutional vagueness briefly. Okay. Then I'll talk about the vagueness just for a few brief moments. The Hobbs Act extortion is not unconstitutionally vague here as applied to Miss Sutton. I think the first thing that I would point this court to is the binding fifth circuit decision from 1980 in United States v.  That's at 621 F dot 2d 123. And then Penn site 125 there, there, this court's predecessor rejected a facial, facial constitutional vagueness challenge to the Hobbs Act extortion statute. And I recognize that's different than the claim that's been raised here. And here we confront an as applied situation, but in rejecting that challenge, this court said that the Hobbs Act extortion statutes language is precise. It's clear. It's broad to be clear. The statute can reach a number of extortion schemes done through fear of loss or under color official right. But there's no ambiguity in what the statute is in the sort of conduct that's trying to be prohibited. I think that's also reflected by the fact that fear of economic loss prosecutions like this one have been accepted in this circuit for well over 40 years at this point. The second thing that I would say, the concept of extortion generally is not one that people generally are unaware of what it means. Extortion is an old common law crime, much like murder or robbery. It's a word that even your average citizen has some understanding of what the word means, right? I mean, you know, we walk into a store and the prices are far too high. You say I'm being extorted. This is not some arcane legal word of the sort that can give us concerns about constitutional vagueness. The statute's language is also particularly clear here, right? I mean, it says that extortion be committed based on threats, violence, fear, or under color official right. And just that structure itself makes clear that it's not limited to violence or force. There are other ways to commit extortion. Just thinking out loud, how does your hypothetical about the ordinary person walking into a store and thinking the prices are too high, therefore I'm being extorted, which way does that cut? I mean, that seems to me to suggest that the language is being mangled in ordinary understanding to mean something that it doesn't mean here in the statute. I mean, no one thinks that when you walk into a store, there is a threat that something is going to be taken from you. And yet, as you say, we use the language of extortion to describe that concept. I tend to think that actually serves her purposes, not yours. I don't mean to say that the common extortion precisely tracks the legal one. And we are concerned with the legal one and ultimately whether or not the statutes terms are sufficiently clear. I do think,  for example, if you're in the grocery store, the groceries are an essential economic need. And if you say you're being extorted, it's almost a fear of like livelihood or economic harm, right? I mean, it's not actually, I'm not saying you can charge grocery stores, but I don't think that the Delta between that common lay understanding and the more precise legal understandings that play in the Hobbs act extortion statute is as great as maybe your question suggests. Finally, I think much of the thrust of Ms. Sutton's constitutional vagueness argument is the fact that the jury was here called to weigh in on whether or not she had, she and Mr. Beasley had the requisite mens rea necessary to obtain a conviction under this theory of Hobbs act extortion liability. And what she's getting at, I think at bottom is the fact that improving mens rea, the government will almost always have to rely on circumstantial evidence or statements that are subtle, indirect, capable of multiple meanings. That's not a problem though, with constitutional vagueness. That's just the fact that there are going to be situations where there are close cases. And the fact that there might be close cases has never been a ground to find a statute unconstitutionally vague as applied. That's straight from United States v.  the Supreme court's decision in 2008. With that, I don't have anything further to say on the vagueness point, but if this court has any further questions about the case, I'm happy to take them. Thank you. Counsel Ms. Dunn rebuttal. In researching all the cases from the 11th circuit and even other circuits under this statute, I haven't found any case that was just a request from somebody for something without more, without a, or else, or a, I know you need such and such. So I want you to give me such and such. At least there's a wink and a nod. In this case, there is nothing in addition to that, that Ms. Sutton did other than ask for the money for the legal defense fund. And we know that the jury had to find that there was a legal defense fund request because it was multiple testimony about it. And of course, Williams testified about it and so did Beasley, but then they acquitted her of the bribery count. The reasonableness of Beasley's understanding of this contract, I'm sorry, but when you're a party to a contract and you're a subcontractor supposed to be making $11 million to then suggest you're not smart enough to read a provision that says automatically renews is a little ridiculous, right? It's just ridiculous. If he, if he's involved in this contract, he's reading this contract, he should have known that it automatically renewed and it would be unreasonable for him to think the contract said something that is absolutely contrary to what it said. So that, that alone shows his unreasonableness. When you look at, when you look at a case like this too, though, you have to look at their relationship, right? You don't look at just what happens today. And yes, you do look at what happened two years ago where she asked him to do something. He didn't do it. And she went ahead and voted for him to have the contract. There's no evidence that she would have done anything going forward to undermine his rights. She never had. In fact, they had known each other for seven years by 2014. Her son had worked for him. They knew each other in 2007 when judge Newsom was a young man. Right? So they had, they had a long course of conduct. He testified at length. He never once suggested she ever said anything to suggest that she would take any kind of work away from him. And in fact, her conduct was such that she never did. He didn't pay a thousand dollars when it was discussed with Morris Williams to increase. He only paid 500. She did nothing. He stopped paying after two payments. She did nothing. The conduct at issue here proves that his fear was unreasonable. The other thing, when you're talking about void for vagueness, judge Newsom, you wrote a couple opinions that I read in concurrences where you talk about what do words mean and how do people understand them. And one way to possibly think about these things is to put it in an AI machine. So I did that. Like I put it in chat GPT and I put it in Gemini. And every single time I come up with intimidation and coercion, not a request, nicely asked, but intimidation and coercion. So I was looking for a federal definition of coercion. Most federal definitions of coercion require physical violence or threats of physical violence. So I went away from those. So I understand your experiment. You asked the LLMs, what is the ordinary meaning of the term extortion? No, sir. I asked, what does use of fear of economic loss mean? And they came up with coercion. And the one definition of coercion that I found that I thought could be applicable in the law is under 18 United States code section, 1591 a one, which is one of the sex crimes. And it has three prongs for what could be coercion of a minor threats of serious harm. They include financial harm, but threats of serious harm threats, plan a scheme pattern intended to cause a person to believe failure to perform would result in serious harm here. We have no scheme or pattern that, that would fit that process and an abuse of the legal system. None of those things are at work here. It coercion extortion. This, this use use has to mean something more than just a request. Thank you very much. Our next.